STEVEN D. PEARSON (*Pro Hac Vice Pending*)
JAMES J. FARLEY II, State Bar No. 027535
MECKLER BULGER TILSON MARICK & PEARSON LLP
9375 East Shea Boulevard, Suite 100
Scottsdale, Arizona 85260
Telephone:    480-214-4100
Facsimile:    480-214-4112
E-mail:        steve.pearson@mbtlaw.com
              james.farley@mbtlaw.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| J.P. MORGAN SECURITIES, LLC, ) | Case No. _____ |
| ) | |
| Plaintiff, ) | **MEMORANDUM OF LAW IN** |
| ) | **SUPPORT OF PLAINTIFF'S** |
| v.   ) | **MOTION FOR TEMPORARY** |
| ) | **RESTRAINING ORDER** |
| HENRY J. KRICH ) | |
| Defendant. ) | |
| _____ ) | |

Henry J. Krich ("Krich") is a former Private Client Advisor for JPMorgan Chase Bank, N.A. ("JPMC") and J.P. Morgan Securities, LLC ("JPMS").  Despite having executed an enforceable non-solicitation covenant, after resigning from JPMS on May 1, Krich has used that confidential customer information to improperly solicit JPMS's clients.  Krich's conduct violates his contractual, common law and statutory obligations to JPMS, and threatens JPMS with irreparable harm in numerous ways, including disclosures of proprietary and confidential business and customer information, and loss of good will and business reputation, and present and future economic loss, all of which Krich expressly recognized in his agreement would entitle JPMS to injunctive relief due to the presence of immediate and irreparable injury to JPMS that cannot be compensated by monetary damages.  JPMS has also concurrently

1

1  filed a claim for arbitration with the Financial Industry Regulatory Authority

2  ("FINRA") and therefore seeks this Temporary Restraining Order ("TRO") for

3  purposes of maintaining the status quo until the parties can arbitrate their dispute.

4  **I.      FACTS**

5              **A.      JPMC's Customers and Goodwill**

6          JPMC provides traditional banking, investment and trust and estate services

7  through its branch offices, including those located in Phoenix, Arizona.   (See

8  Complaint ("Comp.") at ¶ 12.)   Unlike "wirehouse" brokerages, JPMC generally

9  develops its own customer relationships through its banking affiliate, JPMorgan Chase

10 Bank N.A.  (Id. at ¶ 13.)  JPMC enjoys near permanent relationships with its banking

11 customers, with some relationships dating back over a number of years.  (Id. at ¶¶ 13.)

12 One of the ways it successfully transforms traditional banking relationships into

13 financial services relationships is by developing and utilizing a system by which

14 JPMC's banking professionals evaluate and refer potential investment account

15 customers to its Financial Advisors employed by its affiliate JPMS.   (Id. ¶ 39.)

16 Pursuant to these substantial expenditures of time effort and resources, JPMC has

17 developed unique customer experiences that support its long-standing client

18 relationships.

19          Thus, JPMC's customers are the lifeblood of its business and JPMC has

20 invested countless resources to maintain its goodwill and compile its customer lists.

21 (Id. at ¶¶ 14, 15.)  In appreciation of this, JPMC assures customers through its Privacy

22 Policy that information about them will not be disclosed to third parties.  (Id. ¶ 15.)

23 Likewise, to sustain a competitive advantage, JPMC maintains the identities of its

24 customers in the strictest of confidence through the use of employee confidentiality

25 agreements, security building access, copy controlled documents and multiple layers

26 of password protections for computer databases and proprietary software systems.  (Id.

27 at ¶¶ 16, 17, 18.)  JPMC also requires its employees to agree to refrain from using this

28

confidential information for any purpose other than to further JPMC's business.  (Id. at ¶ 19.)

**B.      Krich's Employment With JPMC**

As a Private Client Advisor, Krich provided financial services directly to JPMS's and JPMC's customers.  (Comp. ¶ 36.)  Consequently, Krich had access to highly sensitive information about customers, including information about each client's investment and banking needs, all of which Krich promised to use only for JPMC's benefit.  (Id. at ¶¶ 21, 25.)

As of his May 1, 2015 resignation, Krich was servicing over 470 customer accounts with total value of nearly $96 million in assets under management. (Id. at ¶ 40.)   At the time of his hire, Krich was assigned to manage an existing book of business consisting of customer accounts.   (Id. at ¶ 41.)   Krich's top 100 clients represent approximately $83 Million in assets under management, and of those top 100, approximately 6 households are exempted from his Confidentiality and Non-Solicitation Agreement, representing approximately only $8.5 million in assets under management, or less than 11 % of Krich's clients at the time of his resignation.  (Id.) Moreover, the overwhelming majority of those customers whose banking relationships did not predate Krich's employment with JPMS were introduced to him by JPMC branch bankers through the referral process.  (Id. ¶ 42.)   In fact, at the start of his employment, Krich listed only 20 preexisting client relationships, two of which were family.  (Id. ¶ 43.)   In other words, for the overwhelming majority of his top clients, Krich ***did not develop those client relationships*** independent of JPMC, but instead relied on JPMC's business model, referrals, goodwill, strong brand name and existing customer base and resources.  (Id. ¶¶ 39, 44, 45.)

**C.      Krich's Confidentiality And Non-Solicitation Promises**

In connection with his hire in November 2002, Krich signed a Chase Wealth Management Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement ("Agreement"), a true and correct copy of which is attached to the

1   Complaint.  (Compl. ¶ 22, Ex. 1, Johal Decl. at Ex. B.)  Under the Agreement, Krich
2   acknowledged that he understood that JPMC considers its clients and customer
3   relationships important and valuable assets.  (Comp. ¶ 27.)   The Agreement also
4   informed Krich that JPMC's customer information is not known by or readily
5   available to its competitors and that JPMC takes the protection of its customer
6   information very seriously and takes precautions to safeguard the secrecy and privacy
7   of the information.  (Comp. ¶ 24.)  Accordingly, Krich agreed not to solicit or induce
8   customers to leave JPMC and its affiliated companies for a period of 12 months after
9   his employment ended.  (Id. at ¶ 28.)   Krich also agreed to protect JPMC's trade
10  secrets and confidential information, including any information about JPMC's
11  customers, including their *identities*.[1]  (Id. at ¶ 23.)

12       Krich also agreed to adhere to a Code of Conduct ("Code").  By affirming his
13  compliance with the Code, Krich promised he would abide by the restriction on
14  "soliciting the firm's customers", which restriction continued after the termination of
15  Krich's employment.  (Id. at ¶ 47.)

16       **D.       Krich's Resignation and Post-Resignation Acts**

17       On May 1, 2015, Krich resigned his employment with JPMS.  (Comp. ¶ 2.)
18  Since his resignation, JPMS has confirmed that Krich has improperly utilized
19  confidential client information to solicit both clients he developed while at JPMS as
20  well as other JPMC clients.  (Comp. ¶ 48.)   Since his resignation, multiple JPMC
21  clients have advised it that they have been solicited by Krich and wish to remain
22  clients of JPMC.  (Id.)   Krich, with the aid and assistance of Wells Fargo Advisors
23  ("Wells Fargo"), continues to contact customers he previously serviced at JPMS, and

24

25

26  [1]    The term "Confidential Information" includes "names, addresses and telephone
27  numbers of customers and prospective customers"; "account information, financial
    standing, investment holdings and other personal financial data compiled by and/or
28  provided to or by JPMC"; and "specific customer financial needs and
    requirements….." (Comp. ¶ 23.)

4

1   in doing so, he has disclosed information to Wells Fargo that he acquired through

2   improper means. (Comp. ¶¶ 49, 50.)

3   **II.    ARGUMENT**

4          **A.    Standards for a Temporary Restraining Order**

5          A temporary restraining order ("TRO") may be granted where the movant

6   shows that it is likely to succeed on the merits, that it is likely to suffer irreparable

7   harm in the absence of preliminary relief, that the balance of equities tips in its favor,

8   and that an injunction is in the public interest." [2]  Am. Realty Capital Properties Inc. v.

9   Holland, 2014 WL 1379107, at *1 (D. Ariz. Apr. 8, 2014) (quoting Winter v. Natural

10  Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)); Nouveau Riche Corp. v. Tree, 2008

11  WL 5381513, at *4 (D. Ariz. Dec. 23, 2008).  "The moving party may meet this

12  burden by showing either: (1) a combination of probable success on the merits and a

13  possibility of irreparable injury, or (2) the existence of serious questions going to the

14  merits and that the balance of hardships tips sharply in its favor."  Id.; see Phillips v.

15  Fremont Inv. & Loan, 2009 WL 4898259, at *1 (D. Ariz. Dec. 11, 2009).  The Ninth

16  Circuit has explained that "these two alternatives represent 'extremes of a single

17  continuum,' rather than two separate tests. Thus, the greater the relative hardship to the

18  moving party, the less probability of success must be shown." [3]  Phillips, 2009 WL

19  4898259, at *1 (quoting Immigrant Assistant Project of L.A. County Fed'n of Labor

20  (AFLCIO) v. INS, 306 F.3d 842, 873 (9th Cir. 2002)); see Am. Realty Capital

21  Properties Inc., 2014 WL 1379107, at *1.  Moreover, if the public interest may be

22

23  [2]    Even where a dispute (as here) is ultimately to be resolved in arbitration, JPMC
    is entitled to injunctive relief pending the outcome in arbitration.  See, Toyo Tire
24  Holdings Of Americas Inc. v. Cont'l Tire N. Am., Inc., 609 F.3d 975, 981 (9th Cir.
    2010) ("a district court may issue interim injunctive relief on arbitrable claims if
25  interim relief is necessary to preserve the status quo and the meaningfulness of the
26  arbitration process").

27  [3]    The standard for issuing a TRO is the same as that for issuing a preliminary
    injunction. Phillips v. Fremont Inv. & Loan, 2009 WL 4898259, at *1 (D. Ariz. Dec.
28  11, 2009).

1
2

affected by the proposed injunction, it should also be factored into the court's analysis.
Phillips, 2009 WL 4898259, at *1.

3
4

**B.    JPMS is Entitled to Seek Temporary Injunctive Relief in this Court Pending Arbitration**

5
6
7
8
9
10
11
12
13
14
15
16
17

Even where a dispute (as here) is ultimately to be resolved in arbitration, JPMC is entitled to injunctive relief pending the outcome in arbitration.  See, Toyo Tire Holdings Of Americas Inc. v. Cont'l Tire N. Am., Inc., 609 F.3d 975, 981 (9th Cir. 2010).  Many courts have held that a court can grant injunctive relief in an arbitrable dispute pending arbitration, as long as the prerequisites for injunctive relief are satisfied.  See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Grall, 836 F. Supp. 428, 430 (W.D. Mich. 1993); Orbach v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 1994 WL 900431 (E.D. Mich. 1994); See also American Exp. Fin. Advisors, Inc. v. Thorley, 147 F.3d 229, 231 (2d Cir. 1998) (arbitration does not absolve the district court of its responsibility to decide requests for preliminary injunctions on their merits); Blumenthal and Fein v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 910 F.2d 1049, 1051-53 (2d Cir. 1990) (injunctive relief can be granted to prevent the arbitration from becoming a "hollow formality").

18

**C.    JPMS is Likely to Prevail on the Merits of its Claims**

19
20

*1.    JPMS Is Likely To Succeed On Its Claim For Breach of Contractual Non-Solicitation Provisions*

21
22
23
24
25
26
27
28

"Under Arizona law, '[t]he validity of a restrictive covenant is determined by its reasonableness.'" Karp v. Avella of Deer Valley Inc., No. 2013 WL 5435212, *1 (Sept. 30, 2013) (considering non-solicitation provision) (quoting Phoenix Orthopaedic Surgeons, Ltd. v. Peairs, 790 P.2d 752, 758 (Ariz. Ct. App. 1989)).  "A restrictive covenant is reasonable and therefore enforceable by injunction where (1) the restraint does not exceed that necessary to protect the employer's legitimate interests, (2) the restraint would not cause undue hardship to the employee, and (3) the restraint would not cause harm to the public interest." Karp, 2013 WL 5435212, *1 (citations omitted); see Nouveau Riche, 2008 WL 5381513, at *5 ("Although the

1  ultimate question of reasonableness is a question of law, reasonableness is a fact-

2  intensive inquiry that depends on weighing the totality of the circumstances");

3  Olliver/Pilcher Ins. Inc. v. Daniels, 715 P.2d 1218, 1220 (Ariz. 1986) ("What is

4  reasonable depends on the whole subject matter of the contract, the kind, character and

5  location of the business, ... the purpose to be accomplished by the restriction, and [the

6  totality of] circumstances which show the intention of the parties'").

7        Moreover, Arizona law recognizes a distinction between covenants not to

8  compete and anti-piracy or non-solicitation provisions.  Nouveau Riche, 2008 WL

9  5381513, at *5.  "Covenants not to compete are disfavored because they restrain trade,

10  and thus are strictly construed against employers."  Id.  Anti-piracy or non-solicitation

11  provisions are "'designed to prevent former employees from using information learned

12  during employment to divert or to 'steal' customers from the former employer.'"  Zep,

13  Inc. v. Brody Chemical Co., Inc., 2010 WL 1381896, at *4 (D. Ariz. April 6, 2010)

14  (quoting Olliver/Pilcher Ins., Inc. v. Daniels, 715 P.2d 1218, 1219 (Ariz. 1986)).

15  "Because [anti-piracy agreements are] less restrictive on the employee (and thus on

16  free market forces) than a covenant not to compete, an anti-piracy agreement

17  ordinarily is not deemed unreasonable or oppressive."  Hilb, Rogal & Hamilton Co. of

18  Arizona v. McKinney, 946 P.2d 464, 467 (Ct. App. 1997).

19        These agreements are also enforceable under New York law (which governs the

20  Confidentiality and Non-Solicitation Agreement) for similar reasons.  See e.g., Garvin

21  GuyButler Corp. v. Cowen & Co., 155 Misc. 2d 39, 40-41, 588 N.Y.S.2d 56, 57-58

22  (Sup. Ct. N.Y. Co. 1992); North Atlantic Instruments, Inc. v . Haber, 188 F.3d 38, 47-

23  49 (2d Cir. 1999); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rahn, 73 F. Supp. 2d

24  425, 429 (S.D.N.Y. 1999); Ecolab Inc. v. Paolo, 753 F. Supp. 1100, 1112 (E.D.N.Y.

25  1991).

26        Here, JPMS does not seek to stop Krich from making a living or engaging in

27  the profession.  Krich is free to work for any other firm of his choosing and free to

28  compete in any geographic area.  JPMS simply wants to enforce the terms of the

Confidentiality and Non-Solicitation Agreement which Krich has already acknowledged was reasonable both in terms of time and scope.  Enforcement of this Agreement will prevent Krich, for a period of twelve months, only from soliciting those customers *whom he became aware of or with whom he had direct contact* while an employee of JPMS.  This limited restriction is extremely fair and reasonable to protect JPMS's valuable interests in its near-permanent customer relationships.

Arizona courts have found non-solicitation provisions overly broad where they apply to "'any' customer" of the former employer "whether or not" the former employee ever did business with or had a relationship with the customer while working with the former employer.  See Karp, 2013 WL 5435212, at *1 (in preliminary injunction hearing, finding non-solicitation provision applying to "any" customer overly broad as prohibiting contact "even with customers or suppliers with whom he had no proper relationship on behalf of [former employer]"); Nouveau Riche Corp., 2008 WL 5381513, at *5 ("a nonsolicitation restriction may only protect against solicitation of those individuals with whom the [d]efendants have formed a meaningful relationship").  Here, however, JPMS is only seeking to prevent Krich from soliciting the customers he had actual contact with or whose identity was made known to him by virtue of his employment, not all JPMC customers.  The vast majority of these customers were long-time institutional banking customers, which JPMS had assigned to Krich.  JPMS has expended significant efforts to develop and keep secret its database of client information, conferring trade secret status upon such data. Krich would not have had contact with, or confidential information regarding, these customers but for his employment with JPMC.  It would be grossly unfair to JPMS for Krich to steal those customers when he had no involvement in originating them. A twelve-month restriction will protect these longstanding relationships from unfair intrusion.

Additionally, the twelve-month restriction is reasonable in temporal scope as well.  Under Arizona law, when an employee leaves, courts will protect the former

1    employer's legitimate interest in maintaining customer relationships "for as long as

2    may be necessary to replace the employee and give the replacement a chance to show

3    he can do the job."   Karp, 2013 WL 5435212, at *3 (considering non-compete

4    provision, finding based on the evidence before it, 18-month period included in non-

5    compete provision would likely be found reasonable at trial); see Nouveau Riche,

6    2008 WL 5381513, at *5 ("When the restraint is for the purpose of protecting

7    customer relationships, its duration is reasonable only if it is no longer than necessary

8    for the employer to put a new man on the job and for the new employee to have a

9    reasonable opportunity to demonstrate his effectiveness to the customers.").   With

10   respect to restrictive covenants in the financial services industry specifically, a one-

11   year restriction has been found reasonable and not unduly burdensome.   Compass

12   Bank, 430 F.Supp.2d at 980.   Thus, the twelve-month restriction on Krich's ability to

13   solicit business – again, only his ability to solicit JPMC clients he had direct contact

14   with during his employment – is reasonable in temporal scope.

15        Moreover, not only is the restriction enforceable, but Krich has clearly breached

16   the restrictions by soliciting JPMS customers in an attempt to steal these customers for

17   a competitor, Wells Fargo.   Under Arizona law, targeted contact with an employer's

18   customers alone is enough to constitute solicitation.   Compass Bank, 430 F. Supp. 2d

19   at 982.   Certainly, targeted contact with a former employer's clients and an offer of

20   service, or even just providing new contact information initiating customer contact,

21   constitutes a solicitation.   See id. at 981-982; Alpha Tax Services, Inc. v. Stuart, 761

22   P.2d 1073, 1075 (Ct. App.1988).

23                    ***2.      JPMS Is Likely To Succeed On Its Claim For Breach of***
24                    ***Contractual Confidentiality Provisions and On Its Trade Secret***
25                    ***Claims***

26        Arizona employers are entitled to protect their confidential business

27   information and trade secrets, both under common law and under the Arizona Trade

28   Secrets Act.   See Enterprise Leasing Co. v. Ehmke, 3 P.3d 1064 (1999); A.R.S. § 44-
     401, et seq.   Confidential business information and trade secrets "may consist of a

9

1   compilation of information that is continuously used or has the potential to be used in

2   one's business and that gives one an opportunity to obtain an advantage over

3   competitors who do not know of or use it." Ehmke, 3 P.3d at 1068.  The Arizona

4   Trade Secrets Act defines a trade secret as "information, including a formula, pattern,

5   compilation, program, device, method, technique or process" that both derives

6   economic value, actual or potential, from not being generally known and which is

7   subject to efforts to maintain its secrecy.  A.R.S. § 44-401.  Customer information that

8   is truly confidential and to a substantial degree inaccessible may be regarded a trade

9   secret.  Amex Distributing Co., Inc. v. Mascari, 724 P.2d 596, 602 (Ct. App. 1986).

10  Several factors are considered in determining if a customer list qualifies as a trade

11  secret, including: whether the list represents a selective accumulation of detailed,

12  valuable information about customers that naturally would not occur to persons in the

13  business; whether the list was compiled by expending substantial efforts to identify

14  and cultivate a customer base such that it would be difficult for a competitor to acquire

15  or duplicate the information; whether the information contained in the list derives

16  independent economic value from its secrecy and gives the holder a demonstrable

17  competitive advantage; and the extent to which the list is divulged externally and

18  internally.  Calisi v. Unified Financial Services, 302 P.3d 628, 632 (Ct. App. 2013).

19      The confidentiality provisions at issue prevent Krich from disclosing and using

20  JPMS confidential information and are narrowly tailored to protect sensitive customer

21  information.   JPMS owes a duty to its customers to protect their confidential

22  information and required Krich to execute the Agreement to prevent the very harm

23  now occurring.   Krich is in direct competition with JPMS and has disclosed

24  confidential information about its customers to Wells Fargo and used it to solicit

25  business.  If allowed to use this proprietary and confidential information, Krich will

26  gain an unfair and unlawful competitive advantage over JPMS.  These confidentiality

27  provisions do not injure the public and do not exert a hardship on Krich.  Because

28  Krich has breached the terms of his confidentiality agreement for his own benefit,

1  JPMS will likely succeed on the merits of its contractual breach of confidentiality

2  claims.

3        JPMS is also likely to succeed on the merits of its trade secrets claim.  JPMC's

4  client relationships are its most important assets.  JPMS devotes substantial resources

5  to developing its customers and information about their investment preferences.  They

6  have been developed over the course of years, are the product of significant investment

7  of time and resources, and are kept secret by JPMS.  Krich unlawfully misappropriated

8  the information and used it to solicit JPMS customers in derogation of his contractual

9  and statutory obligations.  Examining similar evidence, Arizona courts have concluded

10 that injunctive relief was warranted to prevent further misappropriation of customers

11 by former employees.  See, e.g., Compass Bank, 430 F. Supp.2d at 984 (granting

12 preliminary injunction relating to former employee's solicitation of former employer's

13 customers and use of customer list).

14       For the same reasons explained above, the customer lists are trade secrets under

15 New York, where courts examine the following factors:  (a) the extent to which the

16 information is known outside of the owner's business; (b) the extent to which it is

17 known by employees and others involved in the owner's business; (c) the extent of

18 measures taken by the owner to guard its secrecy; (d) the value of the information to

19 him and to his competitors; (e) the amount of effort of money expended by the owner

20 to develop the information; and (f) the ease or difficulty with which the information

21 could be properly acquired or duplicated by others.  Eagle Comtronics, Inc. v. Pico,

22 Inc., 89 A.D.2d 803, 453 N.Y.S.2d 470, 472 (N.Y. 4th Dep't 1982) (quoting

23 Restatement of Torts § 757 (1939)).  JPMC's customer lists fall squarely within the

24 foregoing definition of trade secret.

25       Krich's unlawful use of JPMS records also constitutes unfair competition.  See

26 Advanced Magnification Instruments of Oneonta, N.Y. Ltd. v. Minuteman Optical

27 Corp., 135 A.D.2d 889, 891, 522 N.Y.S.2d 287, 289 (3d Dep't 1987) ("an employee's

28 illegal physical taking or copying of an employer's files or confidential information

constitutes unfair competition"); <u>Dampf, P.C. v. Bloom</u>, 127 A.D.2d 719, 720, 512 N.Y.S.2d 116, 117 (2d Dep't 1987) (holding that the defendant had engaged in unfair competition by his misappropriation and exploitation of confidential information).

Moreover, having acknowledged and agreed that JPMS customer records were the sole and exclusive property of JPMS, and by using customer records to solicit customers to transfer their accounts from JPMS to Wells Fargo, Defendant has also committed the intentional tort of conversion. <u>Employers' Fire Ins. Co. v. Cotton</u>, 245 N.Y. 102, 105, 156 N.E.2d 629, 630 (1927) (conversion is the unauthorized assumption and exercise of the right to ownership over goods belonging to another to the exclusion of the owner's rights).

### 4. *JPMS Is Likely To Succeed On Its Tort Claims*

Krich tortuously interfered with JPMC's business relations.[4] Having developed and cultivated relations with its customers over many years, JPMS reasonably expected to continue serving those customers. Krich was aware of that reasonable expectation and nevertheless interfered with that expectancy by intentionally soliciting JPMS customers to move their accounts to Wells Fargo and as a result JPMS was damaged. Based on the Defendant's tortious interference, an unjust enrichment[5] will

---

[4] JPMS can prevail on this claim by showing: (1) the existence of a valid business relationship, (2) knowledge of the relationship on the part of the interferor, (3) intentional and improper interference causing a disruption of the relationship, and (4) resulting damage to the party whose relationship has been disrupted. <u>Stetter v. Blackpool, LLC</u>, 2010 WL 1531082, at *2 (D. Ariz. Apr. 15, 2010)

[5] Unjust enrichment occurs whenever a person has and retains money or benefits which in justice and equity belong to another. <u>City of Sierra Vista v. Cochise Enterprises, Inc.</u>, 697 P.2d 1125, 1131 (Ct. App. 1984). "To establish a claim for unjust enrichment, a party must show: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) the absence of justification for the enrichment and the impoverishment; and (5) the absence of a legal remedy." <u>Trustmark Ins. Co. v. Bank One, Arizona, NA</u>, 48 P.3d 485, 491 (Ct. App. 2002), <u>as corrected</u> (June 19, 2002).

1   inure to the Defendant's benefit, and JPMS is entitled to a restraining order to maintain
2   the status quo pending a hearing on the merits.

3      **D.**  **JPMS Will Suffer Irreparable Harm Without Injunctive Relief**

4      Arizona courts recognized that "once a protectable interest is established,
5   irreparable injury is presumed to follow if the interest is not protected." <u>Karp</u>, 2013
6   WL 5435212, *4.  Moreover, in signing the Agreement, Krich expressly recognized
7   and acknowledged that the breach of the restrictive covenants set forth therein would
8   result in irreparable harm for JPMS.  Indeed, the benefit of an injunction far outweighs
9   any possible injury to the Defendants.  JPMS faces enormous losses in the marketplace
10  as well as the loss of irretrievable trade secrets and confidential information.  The
11  Defendant, a skilled sales professional, will not suffer commensurate harm from
12  refraining from using JPMS's confidential information and soliciting JPMS's customer
13  as he is not precluded from pursuing other customers.  Additionally, "because the
14  covenants at issue have only a limited duration, injunctive relief is the only means of
15  effective enforcement." <u>Compass Bank</u>, 430 F.Supp.2d at 983.

16
17     **E.**  **Public Policy Supports the Enforcement of the Restrictive
       Covenants**

18
19     JPMS has a protectable interest in its customer base – one that is recognized
20  under Arizona law.  <u>See</u> <u>Amex Distributing</u>, 724 P.2d at 516 (noting truly confidential
21  customer information can be treated as a trade secret).  This is particularly true where,
22  as here, JPMS renders professional services to its clients, and has sought and
23  developed near-permanent and exclusive relationships with its customers.  JPMS
24  invests considerable time, money and effort in developing each of its customers, many
25  of whom had lengthy banking relationships before being introduced to Krich for the
26  sale of investment products.  JPMS has expended great effort and expense over many
27  years to develop and maintain close relationships with these customers and has taken
28  great lengths to protect information relating to their identity, contact information and
unique investment characteristics.  Furthermore, ***virtually all*** of the accounts Krich

1  serviced (all but 20 out of 470 or just 4%) belonged to customers who were referred or

2  assigned to him by JPMS and/or JPMC.  Thus, *but for* his employment, Krich would

3  not have had access to this customer information.

4         "Courts have held that the public interest is served by protecting a company's

5  right to proprietary information, business operations, and contractual rights."

6  Compass Bank, 430 F.Supp.2d at 983 (citing Merrill Lynch, et al. v. McClafferty, 287

7  F. Supp.2d 1244, 1249 (D. Haw. 2003)).  Businesses must be afforded protection

8  against the wrongful appropriation of confidential information by employees, not only

9  to encourage innovation and invention, but also to establish fair business practices.

10  Enterprise Leasing, 3 P.3d at 1071.  Thus, enforcing the covenants at issue here is

11  consistent with the public policy of protecting a company's interest in its customer

12  base from unfair competition and the protection of trade secrets and confidential

13  information.  Compass Bank, 430 F.Supp.2d at 983 (citing Kewanee Oil Co. v. Bicron

14  Corp., 416 U.S. 470, 481 (1974)).

15         **F.      The Balance of Hardships Markedly Tips in JPMS's Favor**

16         As stated herein, JPMS's relationships with its customers are the cornerstone of

17  its business, which is why it expends great time and effort in developing its

18  relationship with each customer.  The harm it has suffered and will continue to suffer

19  by Defendants' actions is real and was expressly acknowledged as such by Mr. Krich

20  in the Confidentiality and Non-Solicitation Agreement that he signed.  At the same

21  time, although enforcement of the confidentiality and non-solicitation provisions of the

22  Agreement would burden Defendant, the burden was agreed to as a condition of his

23  employment and is not great in that the enforcement would be limited to twelve

24  months and would be limited only to those customers with whom Krich had direct

25  contact with or came to know as a result of his JMPS employment.  Thus, the burden

26  on Defendants is reasonable in both scope and duration and does not come close to

27  outweighing the harm JPMC will suffer if its motion is denied.

28

14

1

## III.    CONCLUSION

2

For all of the foregoing reasons, JPMS's motion should be granted.

3

4

Respectfully submitted this 27th day of May 2015.

5

6

MECKLER BULGER TILSON
MARICK & PEARSON LLP

7

8

By: */s/ James J. Farley II*

9

Steven D. Pearson
James J. Farley II

10

*Attorneys for Plaintiff*

11

12

ORIGINAL electronically filed this 27th day of May 2015 with:

13

Clerk, US District Court
District of Arizona

14

401 West Washington
Phoenix, Arizona  85003

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15