**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| J.P. Morgan Securities LLC,<br><br>            Plaintiff,<br><br>v.<br><br>Henry J. Krich,<br><br>           Defendant. | No. CV-15-00979-PHX-DGC<br><br>**TEMPORARY RESTRAINING ORDER** |

On June 4, 2015, the Court held a hearing on Plaintiff's motion for a temporary restraining order ("TRO"). Doc. 1. After considering the evidence submitted by the parties and their written and oral arguments, the Court will grant the motion.

**I.  Background.**

On May 1, 2015, Defendant Henry Krich resigned from his position as a Private Client Advisor for Plaintiff JPMorgan Chase Bank, N.A. and JPMorgan Securities, LCC (collectively "JPMS") in order to begin working for Wells Fargo Advisors, LCC. Doc. 1, ¶ 2. Krich worked for JPMS as a Financial Advisor from 2002-2007, as an Independent Financial Advisor from 2007-2012, and most recently as a Private Client Advisor. *Id.*, ¶ 36. His position required him to work closely with clients to create a customized, comprehensive investment program. *Id.*, ¶ 37. At the time he resigned, Krich was managing approximately $96 million in assets spread across 470 accounts. *Id.*, ¶ 38. JPMS maintains that Krich did not independently develop most of this business, but was

instead referred to existing customers for investment advice. *Id.*, ¶¶ 39-40. When Krich was hired, he had 20 preexisting clients. *Id.*, ¶ 42.

In 2002, as a condition of his employment, Krich signed a Confidentiality and Non-Solicitation Agreement (the "Agreement") in which he agreed not to use confidential information obtained during his employment and to refrain from soliciting JPMS's clients for 12 months after termination of his employment. *Id.*, ¶¶ 3, 22. The Agreement requires Krich to protect the confidentiality of JPMS's trade secrets and confidential information, which includes names, addresses, and telephone numbers of customers and prospective customers; account information; specific customer needs; information regarding established business relationships; software; and any other information JPMS deemed confidential. *Id.*, ¶ 23. Krich also agreed to comply with JPMS's Code of Conduct, which prohibits employees from soliciting JPMS customers after termination of their employment. *Id.*, ¶ 20.

On May 29, 2015, JPMS filed this action alleging that Krich "improperly utilized confidential client information to solicit both clients he developed while at [JPMS] as well as other JPMS clients." *Id.*, ¶ 48. The complaint asserts that "multiple JPMS clients have advised JPMS that they have been solicited by Krich and wish to remain clients of JPMS," and that Wells Fargo has been assisting Krich's solicitation. *Id.*, ¶¶ 48, 49. The complaint asserts eight causes of action: (1) Breach of Contract – the Confidentiality and Non-Solicitation Agreement, (2) Misappropriation of Trade Secrets, (3) Breach of Fiduciary Duty, (4) Tortious Interference with Business Relationships, (5) Unjust Enrichment, (6) Unfair Competition, (7) Replevin, and (8) Conversion. JPMS seeks a TRO to preserve the status quo pending arbitration of its claims before the Financial Industry Regulatory Authority ("FINRA").

**II.  Legal Standard.**

A TRO is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). A TRO may be granted if

1 the movant "establishes that he is likely to succeed on the merits, that he is likely to
2 suffer irreparable harm in the absence of preliminary relief, that the balance of equities
3 tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res.*
4 *Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  Where, as here, the party requests a TRO
5 pending arbitration, a district court may "issue interim injunctive relief on arbitrable
6 claims if interim relief is necessary to preserve the status quo and the meaningfulness of
7 the arbitration process – provided, of course, that the requirements for granting injunction
8 relief are otherwise satisfied." *Toyo Tire Holdings of Am. v. Continental Tire N.A., Inc.*,
9 609 F.3d 975, 981 (9th Cir. 2010).

**III.  Analysis.**

JPMS asks the Court to prohibit Krich from using confidential customer information gained during his employment to solicit customers "whom he became aware of or with whom he had direct contact while an employee of [JPMS]."  Doc. 3 at 8.

**A.  Likelihood of Success on the Merits.**

In order to demonstrate a likelihood of success on the merits, JPMS must show that the Agreement is enforceable and that Krich has violated it by using JPMS's confidential information or by soliciting its clients.[1]

**1.  Enforceability of the Agreement.**

"The validity of a restrictive covenant is determined by its reasonableness." *Phoenix Orthopedic Surgeons, Ltd. v. Peairs*, 790 P.2d 752, 758 (Ariz. Ct. App. 1989). A restrictive covenant is reasonable and therefore enforceable by injunction where (1) the restraint does not exceed that necessary to protect the employer's legitimate interest, (2) the restraint would not cause undue hardship to the employee, and (3) the restraint would not cause harm to the public interest.  *See id.* at 757; *Valley Med. Specialists v. Farber*, 982 P.2d 1277, 1283 (Ariz. 1999) (en banc).

---

[1] The Agreement is governed by New York law (Doc. 1-1 at 20), but both parties cite Arizona case law and statutes in support of their arguments.  Because the parties have not identified any meaningful differences between Arizona and New York law regarding restrictive covenants, the Court will look to familiar Arizona cases.

1 Other than the restriction on advertisements and announcements discussed below, Krich does not argue that the restrictive covenant at issue in this case is unenforceable. *See* Doc. 9 at 8. Nor would he be likely to succeed in such an argument. The primary covenant Krich signed is an "anti-piracy agreement," which "restricts the terminated employee from soliciting customers of his former employer or making use of confidential information from his previous employment." *Hilb, Rogal & Hamilton Co. of Arizona v. McKinney*, 946 P.2d 464, 467 (Ariz. Ct. App. 1997). "Because it is less restrictive on the employee (and thus on free market forces) than a covenant not to compete, an anti-piracy agreement ordinarily is not deemed unreasonable or oppressive." *Id.*

Employers have "a protectable interest in maintaining customer relationships when an employee leaves." *Bryceland v. Northey*, 772 P.2d 36, 40 (Ariz. Ct. App. 1989). JPMS certainly has an interest in protecting confidential client information and established clientele. *See Farber*, 982 P.2d at 1284 (noting that an employer's clientele is "an asset of value which has been acquired by virtue of effort and expenditures over a period of time, and which should be protected as a form of property"). In addition, the covenant's 12-month duration is likely reasonable. *See Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 981 (D. Ariz. 2006) (finding one year duration of covenant not to compete reasonable where employee left employer to start own firm).

Krich argues that the Agreement is overbroad because it prohibits him from sending out "any advertisement or announcement" of his new employment to clients he serviced. Doc. 9 at 8; Doc. 1-1, ¶ 8(f). He claims that Arizona law permits such announcements if they do not include a solicitation. *See Alpha Tax Services v. Stuart*, 761 P.2d 1073, 1075 (Ariz. Ct. App. 1988). Krich is correct. The court in *Alpha Tax* held that "[m]erely informing customers of one's former employer of a change of employment, without more, is not solicitation." *Id*. The Court agrees that the ban on advertisements and announcements in paragraph 8(f) is likely overly broad under Arizona law, but Arizona cases permit courts to strike out unenforceable provisions if they are grammatically severable from other portions of the contract. *Farber*, 982 P.2d at 1286.

The Court finds paragraph 8(f) of the Agreement to be grammatically severable, concludes that it can be eliminated under Arizona law, and finds that the remainder of the restrictive covenant is likely enforceable.[2]

### 2. Whether Krich Violated the Agreement.

At the TRO hearing, JPMS called Krich's former supervisor at JPMS, Harman Johal, as a witness. Johal testified that me met with Krich upon his resignation and reminded him of the restrictive covenant in the Agreement. Johal then assigned three JPMS employees to contact Krich's JPMS clients and inform them that they would be serviced by new JPMS financial advisors in light of Krich's departure. Upon making the contact, these employees were informed by many of the clients that they had already been contacted by Krich. Some had appointments to meet with him at Wells Fargo.[3]

Krich has presented no evidence to contradict Johal's testimony. Although he provided a declaration in response to the TRO application, it is very narrow. Quoting assertions in a JPMS declaration, Krich states only that "I did not 'improperly utilize confidential client information to solicit clients [I] developed while at JPMS.'" Doc. 9-1. Krich does not state that he has refrained from contacting his former clients, only that he has not "improperly" done so. And when offered the opportunity to continue the TRO hearing so he could present evidence in response to Johal's testimony, Krich declined.

The Court concludes that JPMS is likely to succeed on the merits. The evidence suggests that Krich has violated an enforceable restrictive covenant prohibiting him from contacting JPMS clients for a period of 12 months.

---

[2] The Court notes that although advertisements and announcements are permitted under Arizona law, cases have held that including contact information in a directly-mailed announcement transforms it into a solicitation. *Hartley*, 430 F. Supp. 2d at 981.

[3] Defendant objected at the TRO hearing that Johal's testimony about comments by JPMS clients was hearsay. But "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enter., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); *see also Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) ("It was within the discretion of the district court to accept . . . hearsay for purposes of deciding whether to issue the preliminary injunction."). This principle applies with equal force to TRO hearings.

Krich also argues that JPMS may be a signatory to an industry Protocol that allows financial advisors to take clients with them when they move to other investment firms. Doc. 9-1 at 9. But the letter provided by Krich suggests that the JPMS participation in the Protocol may be limited to former Bear Sterns employees (Krich is not one), and Johal testified that he had no knowledge that the Protocol applied to his office or Krich. Moreover, JPMS notes that Krich did not take the steps required by the Protocol when he left JPMS. The Court is not persuaded that the Protocol will prevent JPMS from succeeding on the merits of its claim.

### B. Irreparable Harm.

Courts are split on whether an investment firm can show irreparable harm from the loss of investment clients to a former employee. Many courts have held that the losses resulting from such harm are difficult to quantify, particularly when, as here, the firm has invested considerable effort in cultivating and growing the goodwill and business of the clients. *See*, *e.g.*, *Thrivent Fin. for Lutherans v. Hutchinson*, 906 F. Supp. 2d 897, 907 (D. Neb. 2012) ("the amount of damages resulting from the solicitation of Thrivent's clients and use of its Confidential Business information would be difficult, if not impossible, to ascertain with any degree of certainty."); *Fid. Brokerage Servs. LLC v. Clemens*, No. 2:13-CV-239, 2013 WL 5936671, at *10 (E.D. Tenn. Nov. 4, 2013) ("While the Court agrees that the loss of fees earned from the customers who transfer their accounts can ultimately be calculated and compensated as money damages if Fidelity prevails on the merits, it does appear to the Court that certain elements of Fidelity's claimed damages in the form of loss of customer referrals and loss of goodwill are very difficult to calculate, or even adequately prove."); *Hilliard v. Clark*, No. 1:07-CV-811, 2007 WL 2589956, at *9 (W.D. Mich. Aug. 31, 2007) ("there was no way to calculate how much the various client portfolios might have grown if they were not transferred, what assets the clients may have earned, inherited or won over time, or what potential referrals transferring clients might have made."); *but see Morgan Stanley v. Frisby*, 163 F. Supp. 2d 1371, 1376 (N.D. Ga. 2001) (investment advisor industry is

heavily regulated, transactions are monitored electronically, every trade is recorded, and any loss to the former firm is easily calculable).

The Court finds the first category of cases more persuasive. It would likely be impossible to determine accurately how much future business JPMS would lose through the loss of Krich's clients. Moreover, Krich himself acknowledged in the Agreement that that JPMS would suffer irreparable harm from his solicitation of former clients. Doc. 1-1 at 19. The Court concludes that JPMS has shown a likelihood of irreparable harm.[4]

### C.  Other Requirements.

Several facts suggest that the equities tip in favor of JPMS: Krich knowingly signed the Agreement, Krich was reminded of it when he resigned, Krich does not dispute that the vast majority of his clients came from JPMS banking and other relationships, and Krich appears to have been violating the Agreement and contacting his former clients. The Court also concludes that enforcement of the Agreement is in the public interest. The Agreement is reasonable in scope as applied in this order, exists only for 12 months, and does not prevent Krich from working in his chosen profession.

### D.  Bond.

Rule 65(c) requires that JPMS provide security in an amount the Court deems proper. Given the short duration of TROs, the Court concludes that $25,000 is sufficient. JPMS will be required to post security in this amount within 48 hours of entry of the TRO.

**IT IS ORDERED:**

1. JPMS's motion for a TRO (Doc. 1) is **granted**.
2. For the duration of this TRO, Defendant Henry J. Krich is enjoined from doing any of the following:
    a. Soliciting or initiating contact with any JPMS clients (other than those

---

[4] The Court asked the parties at the TRO hearing whether FINRA procedures provide an adequate remedy at law for JPMS to obtain immediate injunctive relief. After the hearing, the Court reviewed the FINRA rules and learned that they contemplate judicial entry of a TRO to protect parties from immediate injury. *See* FINRA Rule 13804.

>   listed in Attachment A to the Agreement (Doc. 1-1 at 23)) who were serviced by Krich while he was employed at JPMS or whose names became known to Krich by virtue of his employment at JPMS. This shall include Krich's meeting with JPMS clients as a result of his previous solicitation or initiation of contact with them. This TRO does not prevent Krich or his new employer from issuing generally-disseminated advertisements or announcements of his new employment.
>   b. Using or divulging JPMS's Confidential Information (as defined in paragraph 7 of the Agreement (Doc. 1-1 at 18)).
>   c. Destroying, deleting, or discarding information or evidence related to any actions taken by Krich before the entry of the TRO to solicit or contact any client of JPMS.
> 3. This TRO shall expire 14 days after its entry into the Court's docket.

Dated this 8th day of June, 2015.

_____
David G. Campbell
United States District Judge